UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

- - -

HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,           )
                                    )
          PLAINTIFF,                )
                                    )
VS.                                 )   CASE NO.:
                                    )   CR 20-00002-DOC
HOANG XUAN LE, SHEILA MARIE         )
RITZE,                              )
                                    )
          DEFENDANTS.               )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

FRIDAY, MAY 28, 2021

SANTA ANA, CALIFORNIA


LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
PH: (213) 894-0374

```
1    APPEARANCES OF COUNSEL:

2

3    ON BEHALF OF PLAINTIFF:

4
              BY:  GREGORY SCALLY
5                  VIBHAV MITTAL
              ASSISTANT UNITED STATES ATTORNEY
6
              411 WEST FOURTH STREET
7             SANTA ANA, CA 92701

8
     ON BEHALF OF DEFENDANT LE:
9
              LAW OFFICE OF CRAIG WILKE
10            BY:  CRAIG WILKE, ESQ.
              305 N. HARBOR BOULEVARD
11            SUITE 216
              FULLERTON, CA 92832
12
     ON BEHALF OF DEFENDANT RITZE:
13
              LAW OFFICES OF DAVID WEICHERT
14            BY:  DAVID WEICHERT, ESQ.
              115 AVENIDA MIRAMAR
15            SAN CLEMENTE, CA 92672

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1

2                              INDEX

3

4
     PROCEEDINGS                              PAGE
5

6    VARIOUS PRE-TRIAL MOTIONS                  4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
1         SANTA ANA, CALIFORNIA; FRIDAY, MAY 28, 2021; 9:25 A.M.

2                              - - -

3              THE COURT:  Good morning.

4              We're on the record in the matter of United States

5    versus Hoang Xuan Le.  You can sit and use the microphones in

6    front of you.  Stay seated when you address me.  Keep the

7    masks off or on.  The codefendant, and I'm going to

8    mispronounce the name, Sheila Ritze.  And Mr. Weichert's

9    present if you'd make an appearance.

10             MR. WEICHERT:  Yes.  David Weichert on behalf of

11   Sheila Ritze who is present at counsel table.  And with me

12   also is William Migler from my office.

13             THE COURT:  And then you'd make your appearance.

14             MR. WILKE:  Thank you, Your Honor.  Craig Wilke on

15   behalf of Hoang Xuan Le.  Also, with me at counsel table is

16   Sheila Mojtehedi.

17             THE COURT:  Okay.  And then for the government, and

18   I reversed the appearances, my apologies.

19             MR. SCALLY:  Good morning, Your Honor.  Greg Scally

20   and Vibhav Mittal for the United States.

21             THE COURT:  Nice seeing you.

22             We have a number of motions today and one motion

23   I'd like to take up immediately is an ex parte motion and I

24   may have to ask you to remain outside just a moment.  And

25   just in an abundance of caution, would you go along with any
```

1  of your folks outside so I could have a discussion with

2  Mr. Wilke about a motion that was filed and see if that's

3  been fulfilled or not.  Unless you have no objection.

4          MR. WILKE:  The only ex parte I'm aware --

5          THE COURT:  No, don't say it.  I'm just gonna hand

6  it to you.  Would you hand this to Mr. Wilke?

7          So Mr. Wilke, maybe it's not necessary that we

8  recess.  I just want to be careful when you file something

9  ex parte and under seal.

10          MR. WILKE:  Yes, this has been handled already.

11  We're still waiting.

12          THE COURT:  Don't fold up my precious piece of

13  paper.  No, I'm just joking.  Read it.  Because what you'll

14  see is I've stapled them together so there's another document

15  behind it.

16          MR. WILKE:  Yes.

17          THE COURT:  Now, it's relevant.  I intend to have

18  this occur.  And if you're having any difficulties, I'll

19  resolve that literally today.  I want that information to

20  you.  It's important.

21          MR. WILKE:  No difficulties as of yet that I'm

22  aware of.

23          THE COURT:  No, no.  Check's in the mail.  I've got

24  it.  I want that information to you.

25          MR. WILKE:  And I understand by June 14th it will

1    be.

2         THE COURT:  If it's not, you'll call Kelly.  You'll

3    reschedule that.  You're entitled to that information.  It's

4    vital and it better be forthcoming.

5         MR. WILKE:  I have every reason to believe it will

6    be.

7         THE COURT:  If there's no problem, Kelly, set that

8    off to the side.  The second is a renewed request concerning

9    these jurisdictional issues that came before the Court, and

10   I'm going to take that up at the last portion of today's

11   hearing.  I have to tell you I'm still tentatively inclined,

12   although both of you are joining in this request according to

13   Mr. Wilke's documents, to decline your offer.

14        I'm still inclined, but subject to your argument

15   today and I'm listening to it, about why I need to decide a

16   discretionary call without a factual basis in front of the

17   Court or a stipulated factual basis.  And I have repeatedly

18   asked, you know, what is the best information about

19   triangulation, communication and I've gotten none of that.

20   So I view this as a motion that I would take at the end of

21   the government's case at the first opportunity, but I'm

22   listening to that carefully.

23        I think frankly and tactically, you may both need

24   this to decide if this should go over to state court

25   depending upon my ruling.  And I understand the government's

1    concern about jeopardy attaching and by the same token from

2    the defense's perspective, if it should go over to state

3    court so I understand your joint interest.

4          I do not understand yet because this is

5    discretionary why the Court would make that decision until I

6    have a full and complete record in front of me.  So I alert

7    you to that.  I am going to listen to you carefully today,

8    but I'm not too concerned quite frankly about the tactical

9    posture you find yourself in.  You had the choice of where to

10   file.

11         Well, then I don't care what order we take your

12   motions in.  I think I've got them divided out here, but let

13   me just start with the general preamble that we've dealt with

14   so many times on conspiracy to commit murder.  Substantive

15   count of murder I think is your Count 1.  I forget.  Count 1

16   I think is your murder count, Count 2 is your conspiracy and

17   Count 3 is your weapon.  And then you filed additional counts

18   and I don't have them all memorized, but one through 5,000.

19   I'm just joking with you.

20         Historically and maybe incorrectly, I have not

21   allowed the government to read through the preamble

22   concerning conspiracy.  I've simply taken those charges

23   including the overt acts contained within those charges as

24   those counts that would literally be read to the jury.  And

25   my past rulings have been that the prejudicial effect

```
1    outweighs the probative value because these are matters of

2    evidence that you're going to present to the jury.

3              And in a sense it's an opening statement about what

4    you hope to present and therefore, you're not precluded from

5    it.  You're just precluded from preconditioning the jury for

6    in your case just a few comments -- just a few pages.  The

7    Aryan Brotherhood I think had two pages because we had 31

8    murders.  So I'm listening to your argument.  You have to

9    know that historically with the Mexican Mafia, the Aryan

10   Brotherhood, MS-13, I have not allowed the preamble to be

11   read.  I've allowed the substantive counts to be read.

12             Second, these are just tentative thoughts.  I'm not

13   chiding you nor concerned, but we've had a long time from the

14   filing of the original claims or counts which are murder

15   that's what this is about.  And now the subsequent filing of

16   additional counts concerning I think two transactions

17   involving some marijuana sales.

18             Your argument in your papers are that this would

19   show a relationship, but you also have a relationship between

20   the tracking device that was put on the car from my

21   understanding of the documentation and subsequent

22   conversations about that.  So in your document you're

23   concerned about the court having two trials.  Don't worry

24   about it.  I'm not busy.  I'm not concerned about having

25   short trials.
```

1          And I'm a little concerned that the prejudicial

2     effect outweighs the probative value, but I'm hesitant

3     because if there's a conversation for instance that comes up

4     in one of those narcotics transactions that relates back to

5     the murder, I want to have that thoughtful discussion with

6     you today because I don't think I'm comfortable precluding

7     that kind of evidence, but I'm very uncomfortable having a

8     $100 marijuana sale or $200 marijuana sale drive this

9     litigation.

10          So let's talk about that for a moment because it's

11     not my intent to preclude you from a conversation where they

12     might be selling dope and saying, by the way, dump him

13     overboard and I'm just kidding you. So I don't know how to

14     sanitize that. If you do, I want to hear more from you. I'm

15     inclined to grant the severance concerning the subsequently

16     filed marijuana sales. I think they're two in nature.

17          The third is the surplusage. See, I used to write

18     these things for years. I used to be in charge of murder

19     cases across the street. The word victim is a wonderful

20     word. Usually I would like to write, I'm just joking with

21     you, the poor victim. No, no. It's prejudicial.

22          The defense might have a different view of whether

23     this person is a victim and if so, to what extent and that's

24     a conclusionary word. It's Mr. Le or Ms. Ritze, it's the

25     defendant, but it's not the victim. So we're gonna strike

1    all that and rewrite it.  That's easy to do.  I think you

2    mentioned it 32 or 33 times.

3          The next is the more complicated area and that is

4    the conspiracy to commit murder and the division between the

5    conspiracy to commit murder in the first degree and

6    conspiracy to commit murder in the second degree.  I have

7    always been baffled by that.  I had always thought that the

8    degree didn't matter concerning a conspiracy to commit murder

9    because the end result is that the punishment was the same.

10          Let me turn this around backwards for a moment

11    because it's been a lot of years and trust me, I'm not

12    certain of this.  You have the murder charge and eventually

13    an instruction whether this is premeditated and deliberate

14    malice aforethought or not which could lead to a second and

15    within the second degree murder, you typically will get two

16    theorys under the substantive charge.

17          One, that there's intent to commit murder.  Okay?

18    Maybe not premeditated and deliberated, but there's also this

19    what I'm gonna call grave risk taking for want of a better

20    word and that's not the legal term.  You've got two vehicles

21    to get there.  One might be okay, they got in a fight.  There

22    may not be self-defense, chance to save him, didn't throw the

23    life line overboard.  So even if it is self-defense, let's

24    take a look at that and see if it really is from your

25    perspective as a prosecutor.

1              When we get to conspiracy to commit murder, I

2      haven't instructed in the past there's conspiracy to commit

3      first degree murder or conspiracy to commit second degree

4      murder or if there's a conspiracy to commit second degree

5      murder, there's an intentional second degree murder and then

6      a, let's say, wanton disregard for human life aspect of it.

7      Because I think you're really governed by the punishment and

8      the punishment's the same on a conspiracy to commit murder.

9              There's no differentiation between first and second

10     degree.  So my inclination going in with a small degree of

11     uncertainty is that I'm inclined to get rid of this

12     demarcation between first degree murder and second degree

13     murder on your conspiracy count because I don't think it

14     changes the punishment.  Your punishment is exactly the same.

15             Now, you're gonna push back on that, but I think

16     I'm gonna save myself a reversal quite frankly and a lot of

17     confusion from the jury.  Now, I see Mr. Wilke nodding his

18     head vigorously because he must have a kink in his neck or he

19     agrees with all my rulings so far.  I'm just joking.  So I

20     want to hear from the government and let's just start with

21     surplusage for a moment.  Now, I may have missed one or two

22     steps.  So victim, by the way, can we get rid of victim?

23             MR. SCALLY:  Yes, Your Honor.  That one we did

24     concede on the papers.

25             THE COURT:  There's a couple others that he had in

1    there.  Let me just get this out for a moment.  All the

2    yellow underlining done is mine.  I want to make sure for my

3    record I have everything you've submitted.  Document 151,

4    154 -- I'm sorry.  151-1, 154, 166 and 174.  And you joined

5    in all of these so if I can get the record right or correct

6    with Mr. Wilk, then Mr. Weichert, you're. . .

7            MR. WEICHERT:  I'll adopt Mr. Wilke's argument

8    unless he says something that I should say, but I don't

9    anticipate that happening.

10           THE COURT:  I want to give you an overall figure.

11   I've got all the stuff I think you submitted to me.  I gave

12   you that thought going in.  Then you can push back with vigor

13   and tell the Court why I should reverse that tentative

14   thought.

15           Now, have I missed anything, Mr. Wilke?

16           MR. WILKE:  I don't believe so, Your Honor.

17           THE COURT:  Okay.  One of the phrases was AR-15.

18   Tentative, you can use it.  It's an AR-15 for goodness sakes.

19   You can even refer to it as a ghost gun if a witness says

20   it's a ghost gun, but you can't refer to that in the

21   opening or -- strike that -- in the way you've alleged it

22   under your overt acts.

23           I'm taking out ghost gun.  But if a witness gets on

24   the stand and says this is commonly known as a ghost gun

25   because it's got no number serial numbers, from then on if I

1    have that evidence, it's a ghost gun.

2          The second thing reference to legitimate, let's see

3    if I can find my notes here.  Oh, yeah, bearing no legitimate

4    manufacturer mark or serial number.  That's a conclusion and

5    I'm inclined to strike that.  Now, later on you're going to

6    get a witness hopefully up on the stand from your perspective

7    and say Judge, commonly we call these in the trade ghost

8    guns.  They don't have serial numbers.  They're not a

9    legitimate weapon that goes through the NICS system.

10          You know what the NICS system is?  It's a

11   registration system.  Through the NICS system.  So all that's

12   coming in.  It's just not coming in, if you have those

13   witnesses, it's not coming in as a precondition.

14          So tentatively I would instruct you to strike ghost

15   gun.  I would tentatively instruct you to strike victim, and

16   I would tentatively instruct you no bearing legitimate

17   manufacturer's mark or serial numbers be stricken, but AR-15

18   remains or any other identification of a weapon, Mossberg

19   shotgun, AK 47, whatever you've got is fine.  I think that

20   those are my tentative thoughts so let me hear from the

21   government.

22          MR. SCALLY:  Thank you, Your Honor.

23          I don't think the government has a problem with

24   most of that.  You know, if I'm understanding the Court's

25   ruling correctly, it's basically that that's not gonna be

```
1     read to the jury --

2               THE COURT:  That's right.

3               MR. SCALLY:  -- upfront.  That's perfectly

4     acceptable to the government.

5               THE COURT:  Not foreclosing you at all.  Not

6     foreclosing you if a witness gets on the stand and says I'm

7     an expert or a police officer and I commonly refer to these

8     as ghost guns.  That's commonly known in the trade.  It's

9     just that preconditioning going in of words like victim or

10    ghost gun, I'm going to strike those.

11              MR. SCALLY:  And that's fine, Your Honor.

12              THE COURT:  Now, the other is the conclusionary

13    phrase that I just said bearing no legitimate.  That's a

14    conclusion, that's argument.  I'm inclined to strike that.

15              MR. SCALLY:  I think that's fine, Your Honor.

16              THE COURT:  I'm not precluding any evidence.  It's

17    just the way the jury gets conditioned to begin with.

18              All right.  Now, Mr. Wilke strike back if we

19    haven't covered any of the initial surplusage claims.

20              MR. WILKE:  So if I can just clarify, Your Honor,

21    on a couple points?

22              THE COURT:  I don't need clarification.  I just

23    told you what I was going to do.

24              MR. WILKE:  I understand ghost gun is out.  I

25    understand the term victim's out.  If I understand, the term
```

1    no legitimate is out.

2            THE COURT:  And AR-15 is in.

3            MR. WILKE:  We didn't object to that.

4            I understand the Court's gonna strike the degrees

5    of murder from --

6            THE COURT:  No, no, we're not there yet.

7            MR. WILKE:  Oh, we're not on that.

8            THE COURT:  Just one-by-one in the telephone book

9    so to speak.  Okay?  And those are final rulings.

10            Now, let's go back to the. . . Oh, the severance.

11    Let's take that next.  These are the subsequent narcotics

12    charge and. . . Counts 1 through 3 charge Mr. Le with first

13    degree murder, conspiracy to commit murder and using a gun

14    during and in relation to the first degree murder.

15            Count 2 from memory charges the conspiracy to

16    commit murder and alleges that Le lured Dao to Ms. Ritze's

17    boat and attempted to confirm that Dao had an active life

18    insurance policy.  That Le and Ritze took Dao out to the

19    ocean on Ritze's boat.  Le shot Dao and threw him overboard

20    and that Le and Ritze left Dao in the ocean to die.

21            Count 2 alleges eight overt acts from October 14th

22    and 15th, 2019 in furtherance of a conspiracy to murder which

23    provide additional specificity regarding these allegations.

24            Now, I'm literally reading so you know where I'm at

25    from the summary of the statement of facts in Mr. Wilke's

1     filing which is Document 147.  I've independently, of course,

2     gone to the indictment to look at that.

3          Let's take the first concern and that is although

4     I'm tentatively prepared to strike the preamble on the

5     conspiracy and only allow you to read the substantive counts,

6     the overt acts by the way, then I want you to make your

7     record and push back.

8          MR. SCALLY:  With respect to the severance,

9     Your Honor?

10          THE COURT:  With respect to the reading to the jury

11     the preamble on the conspiracy.

12          MR. SCALLY:  We submit on that, Your Honor.

13          THE COURT:  Okay.  That will be a final ruling

14     then.

15          Now, let's go to the second concern and that is the

16     severance of Counts 1, 2 and 3 from Count 4 through 12.  And

17     one of those counts is a false statement made to the

18     investigating agency.  One of the reasons that the severance

19     was granted was is the age-old problem, so you understand the

20     Court's prior ruling whether you agree with it or not,

21     because I know from judicial efficiency joinder is favored,

22     but I don't know what's going to occur at trial in a joint

23     case.

24          Let's say hypothetically Mr. Le testifies.  Let's

25     say hypothetically Mr. Le says self-defense.  Let's assume,

1    though, that in some way in his testimony it implicates by

2    even showing the presence at the scene which you can readily

3    prove or he makes some statement that is potentially

4    incriminating to Ms. Ritze.

5         Now, Ms. Ritze may at a joint trial taken the

6    position along with counsel, I'm not testifying.  That's when

7    we get into a real problem of balancing the privilege against

8    self-incrimination what this means versus the hearsay

9    statement that is supposedly cleared up by some judge reading

10   an admonition ladies and gentlemen, you can take this into

11   account, but you can't forget what you just heard.  It's

12   called cat out of the bag.

13        I don't care how we instruct.  The Circuit may

14   uphold this, but it's just not a fair trial so that's why a

15   severance occurred.  And quite frankly I don't care if I have

16   eight weeks with each of you.  You're very nice counsel on

17   both sides so that makes no difference.  It's better than an

18   ERISA case; right?  So that's why the severance was granted,

19   okay?  Because I couldn't foresee all the problems and all of

20   the slicing and dicing we'd have to do.

21        At the end of the day, all of us have to drive home

22   and think it's a fair trial.  No matter how we dress this up,

23   you've got to be able to get in your car and basically say,

24   you know, made some mistakes that day, but we did give the

25   parties a fair trial.  And you've got to be a prosecutor who

1  says the defense got a fair shake so that's why the

2  severance.

3          Now, let's go back.  Here come our narcotics.

4  Let's take our narcotics counts first.  If you have

5  statements made pursuant to those transactions, CS-1 and

6  CS-2, I forget the designation, then I need to see if those

7  could be sanitized to come in.  But I'm not enthusiastic with

8  the argument that gee, Judge, we're trying to show a

9  subsequent relationship with the parties.

10          Because from my reading, I understood that

11  Ms. Ritze and Mr. Dao jointly put a little tracking device on

12  Mr. Dao's girlfriend or common law wife's car.  That's pretty

13  strong evidence of a subsequent relationship and you've got

14  conversations I think surrounding that.  And if that does

15  include a little bit of the narcotics trade, I'm probably not

16  too concerned.  By the way, we're gonna sell some marijuana

17  because it's part of that process.

18          I am concerned when we then move into di minimus

19  narcotics transactions then encompassing, if you will, the

20  gravamen of this man's murder charge so push back.

21          MR. SCALLY:  Your Honor, I think it makes sense to

22  treat the Mr. Le's motion to severe separately from

23  Ms. Ritze's motion to severe.  I'd like to with the Court's

24  permission address Mr. Le's motion to severe first.  And I

25  think the Court has hit upon the crucial analysis that has to

1    be done here which is the extent and likelihood of the

2    evidentiary overlap.

3         And that essentially in these subsequent narcotics

4    transactions that Mr. Le is engaged in, he's selling

5    methamphetamine, cocaine and methamphetamine to the CI, they

6    have discussions.

7         THE COURT:  Let's take each one individually so I

8    don't get confused.  So take the date, a couple days later,

9    then a couple weeks later.  I think the murder allegedly or

10   alleged murder took place or homicide let's say on

11   October 19th?

12        MR. SCALLY:  October 15th, Your Honor.

13        THE COURT:  And then the first narcotic sale I

14   think it's Informant No. 1.  And the date of that would be?

15        MR. SCALLY:  The date of first sale to the CI by

16   Mr. Le, Your Honor, is November 10th.

17        THE COURT:  Now, is Mr. Le the sole person involved

18   in this sale?

19        MR. SCALLY:  Yes, Your Honor.

20        THE COURT:  Okay.  Just a moment.  And I forget the

21   amount.  It's marijuana, isn't it?

22        MR. SCALLY:  No, Your Honor.  The November 10th

23   sale is a sale of cocaine.  It's a small amount of cocaine.

24        THE COURT:  Cocaine.  That changes all of my

25   thoughts, Counsel.  I'm just joking.  Is it $200, $100, what?

1              MR. SCALLY:  It's 1.9 grams.

2              THE COURT:  Well, I'm not a user so how much is it?

3    $100?

4              MR. SCALLY:  I would need a moment to see how much

5    we paid for it.

6              THE COURT:  It's in the documents some place.  I

7    believe it was a hundred or $200 worth.  And I think the

8    other one's marijuana.

9              MR. SCALLY:  It looks like he paid $180 for that.

10             THE COURT:  And the other one then is December 10,

11   2019.

12             MR. SCALLY:  In terms of further narcotics sales by

13   Mr. Le to the CI, Your Honor?

14             THE COURT:  Yeah.

15             MR. SCALLY:  No, there's then November 20th in

16   Count 7.

17             THE COURT:  Just a moment.  Let's do November 20th.

18   Is Le the sole seller?

19             MR. SCALLY:  Yes, Your Honor.

20             THE COURT:  Is that cocaine?

21             MR. SCALLY:  That is cocaine.

22             THE COURT:  Amount?

23             MR. SCALLY:  35.6 grams, Your Honor.

24             THE COURT:  Money amount?

25             MR. SCALLY:  I'm sorry, Your Honor.  Let me change

```
 1    the amount first.  35.6 is a -- is a total amount.  The
 2    ultimate amount was 27.7 grams of cocaine and it was
 3    purchased for, I believe, it's a thousand dollars,
 4    Your Honor.
 5              THE COURT:  The November 10th, 2019, what count is
 6    that?
 7              MR. SCALLY:  November 10th is Count 6, Your Honor.
 8              THE COURT:  Okay.  Next sale.  Now, are both of
 9    these to CS-1?
10              MR. SCALLY:  Yes, Your Honor.
11              THE COURT:  Next sale.
12              MR. SCALLY:  After the November 20th sale, there's
13    a sale on December 5th.
14              THE COURT:  December 6th?
15              MR. SCALLY:  5th, Your Honor.
16              THE COURT:  And that would be. . . Just a moment.
17    Is Mr. Le the sole person involved in that sale?
18              MR. SCALLY:  Yes, Your Honor.
19              THE COURT:  And is that still to CS-1?
20              MR. SCALLY:  Yes, Your Honor.
21              THE COURT:  And is that cocaine?
22              MR. SCALLY:  No, Your Honor.  That's 55 -- excuse
23    me.  54.7 grams of methamphetamine.
24              THE COURT:  And the purchase price?
25              MR. SCALLY:  Your Honor, if I could just have a
```

1    brief moment?  I don't think I have that in front of me, but

2    if I could check with the agents.  Your Honor, I don't have

3    the purchase price.

4            THE COURT:  That's okay.  54.7 grams.  Doesn't

5    matter to me if it's a thousand or 2,000.  And that's count

6    what?

7            MR. SCALLY:  Count 8, Your Honor.

8            THE COURT:  Next.

9            MR. SCALLY:  The next sale by Mr. Le that doesn't

10   involve Ms. Ritze is speaking to Count 10.

11           THE COURT:  Date?

12           MR. SCALLY:  December 10th.

13           THE COURT:  So Le is the sole seller?

14           MR. SCALLY:  Yes, Your Honor.

15           THE COURT:  And the substance?

16           MR. SCALLY:  56.5 grams of methamphetamine.

17           THE COURT:  Okay.  Now, just a moment.  Is there

18   any other sale with just Mr. Le?

19           MR. SCALLY:  No sale, Your Honor.  Then there's

20   just possession, possession with intent to distribute.

21           THE COURT:  Just a moment.  Just Mr. Le.

22           MR. SCALLY:  Correct.

23           THE COURT:  What count would that be?

24           MR. SCALLY:  The possession with intent to

25   distribute is Count 11.

```
 1                THE COURT:  Date?

 2                MR. SCALLY:  December 19th.

 3                THE COURT:  Le is the sole person named?

 4                MR. SCALLY:  Correct, Your Honor.

 5                THE COURT:  That's possession with intent to sell.

 6      Meth?

 7                MR. SCALLY:  Yes, Your Honor.

 8                THE COURT:  Quantity?

 9                MR. SCALLY:  57.1 grams.

10                THE COURT:  Okay.  Now, you wanted to separate out

11      the two.  By the way was this with CS-1 also?

12                MR. SCALLY:  Well, it's just alleged as possession

13      with intent to distribute so there's no, there's no --

14      there's no CI involved in Mr. Le's, you know, individual

15      possession of the methamphetamine.

16                THE COURT:  Is he arrested on this date and this is

17      found in his possession?

18                MR. SCALLY:  Exactly, Your Honor.

19                THE COURT:  Any other counts where you have Mr. Le

20      solely designated?

21                MR. SCALLY:  Just the 924 C in Count 12 that

22      alleges his possession of firearms.  Again, on December 19th

23      at his arrest in furtherance of his drug trafficking crime

24      from the prior count, the possession with intent to

25      distribute.
```

1          THE COURT:  All right.  Now, I wouldn't think my

2    ruling would affect in any way Count 11 or 12 because you

3    obviously don't have potential conversations that might be

4    tape recorded.  You might have a subsequent statement made by

5    him which we'll get to in a moment.

6          So I'm gonna go back to Counts 6, 7, 8 and 10.  As

7    to Count 6, November 10, 2019 with CS-1 is this recorded?

8          MR. SCALLY:  Yes, Your Honor.

9          THE COURT:  And in that conversation, does he say

10   anything to CS-1 about the alleged incident involving

11   Mr. Dao?

12         MR. SCALLY:  Yes, Your Honor.

13         THE COURT:  Read it to me.

14         MR. SCALLY:  "CI:  What's going on with the other

15   thing?  And based on the context we believe that to be a

16   reference.

17         "MR. LE:  Yesterday, yesterday, they said nothing.

18   What are you gonna say?  No one said nothing.  No one said

19   anything.  I'm in the clear so far.

20         "CI:  Well, teach me how to do that shit.

21         "MR. LE:  Huh?

22         "CI:  Teach me how to do that shit so I can get rid

23   of some people, too.  Shit.  You know what I mean?

24         "MR. LE:  Well, that's what happened, too.

25         "CI:  Huh?

```
 1              "MR. LE:  Even he knows what I do.  There's the
 2     problem."
 3              And this is reference the victim's brother.
 4              "CI:  Uh-huh, who knows.
 5              "MR. LE:  They will -- his brother came for the
 6     same thing, too.  Okay?  He paid to take out the trash.
 7              "CI:  Uh-huh, what the fuck?
 8              "MR. LE:  That's it.
 9              "CI:  Yeah, you actually did it?  Oh, you --
10              "MR. LE:  Yeah.
11              "CI:  You the trigger man?
12              "MR. LE:  Huh?
13              "CI:  You the trigger man?
14              "MR. LE:  (Laughing) I'm not the one that -- I'm
15     not -- I just take out the trash.
16              "CI:  Oh, okay, well, I won't --
17              "MR. LE:  That's how.
18              "CI:  Just thinking about it, I'm pissed with -- I
19     saw that with my other homeboys, too, you know what I mean?
20              "MR. LE:  Don't tell them who I am.
21              "CI:  Oh, no, no, no.
22              "MR. LE:  I'm no one.  No one knows who I am.
23              "CI:  Yeah.
24              "MR. LE:  I'm an outside person.  That's it."
25              THE COURT:  I've heard enough.  Now, I know -- I
```

1    read that before.  I just didn't put it in context with the

2    count.

3            My first tentative thought.  First of all, thank

4    goodness this matter is severed because you could take by

5    inference that I'm just the trigger man.  That if this

6    homicide occurred, I know that you also allegedly have

7    statements to an employee or friend of Ms. Ritze where she is

8    talking about luring somebody onto the boat and having that

9    person allegedly murdered.  So I think we've avoided by

10   severance a huge problem.

11           The second thing is that's relevant testimony

12   because it's a statement by Mr. Le concerning the commission

13   of this alleged crime, his involvement, whether he's

14   minimizing it or maximizing it.  It's an overt statement and

15   admission that he committed the crime.  So I'm not precluding

16   you from that evidence.  I'm still concerned why I would let

17   a substantive count come in -- well, that's splitting a fine

18   hair.

19           But on some of these narcotic charges at the end my

20   guess is going to be that you're going to have to retry some

21   of these any way because some of these may not have

22   statements, but let's find out.  Maybe all of them do.  If

23   all of them have statements implicating him, maybe I've made

24   the wrong tentative ruling.  Okay.  So let's see.

25           So first of all, this is going to be evidence that

1    you're going to be allowed to get into court regardless of

2    whether in fact I sever these specific counts or not.  You

3    have a recording of this because you seem to be reading and I

4    read some transcript.  I couldn't match it up with Count 7 or

5    6 at the time.

6              MR. SCALLY:  There is a recording, yes, Your Honor.

7              THE COURT:  So now let's go for a moment before

8    Mr. Wilk argues, once again without the severance you have

9    Ms. Ritze if she's decided not to testify having an admission

10   from Mr. Le who she has a close relationship, it would

11   automatically lead to conviction in the Court's opinion.  It

12   would be highly prejudicial to Ms. Ritze and hearsay.  And

13   then admonition, an instruction by the Court would not cure

14   that.

15             All right.  Count 7 is the November 20th sale,

16   cocaine 27.7 grams, about a thousand dollars.  Did Mr. Le --

17   to CS-1.  Does Mr. Le once again make an admission about his

18   involvement?

19             MR. SCALLY:  Yes, Your Honor.

20             THE COURT:  All right.  Read it to me.

21             MR. SCALLY:  So for some context, the Coast Guard

22   went earlier prior to this, to this statement by Mr. Le to

23   the CI, Coast Guard went to Mr. Le's home to interview him

24   about the fact that the victim was missing.

25             THE COURT:  And this is the statement to the Coast

1    Guard or to the CI?

2              MR. SCALLY:  To the CI, Your Honor.

3              THE COURT:  To the CI.  I've seen these transcripts

4    before.  I'm just having trouble matching them up quickly

5    with the count.  This would be Count 7.

6              MR. SCALLY:  Yes, Your Honor.

7              THE COURT:  Okay.  Read this to me.

8              MR. SCALLY:  "MR. LE:  How can they find anybody?

9    They're two months ago.

10             "CI:  Oh, about that dude?

11             "MR. LE:  Yeah, that's about it.

12             "CI:  They came to your house?  That's crazy.  Why

13   are they questioning you?

14             "MR. LE:  The wife.

15             "CI:  Oh, the wife.

16             "MR. LE:  Yeah, the bitch do that.  I'll check her

17   later tonight.

18             "CI:  Huh?

19             "MR. LE:  I'll check her later.

20             "CI:  You're gonna check her later?  You know it

21   was the wife?

22             "MR. LE:  I know.

23             "CI:  Huh?

24             "MR. LE:  The brother is scared.

25             "CI:  Oh.

1              "MR. LE:  The brother is mad that he lost his

2     40,000 elsewhere.

3              "CI:  Oh, that's crazy.  You gotta be more careful,

4     fool.  Shit.

5              "MR. LE:  I am.  I don't know why.  What happened

6     because, uh, she promised me 500,000.  500 something and she

7     better give me my 100,000 as promised.

8              "CI:  Oh, so you collected a 100,000 already?

9              "MR. LE:  I haven't collected shit yet from her."

10             THE COURT:  Now, is there anything. . .Well, once

11    again he makes an overt statement concerning his committing

12    this crime.

13             MR. SCALLY:  Well, Your Honor, the statement

14    they're two months ago.  It's a reference --

15             THE COURT:  It's a reference back to the incident.

16             MR. SCALLY:  Yes, Your Honor.

17             THE COURT:  It's not I did it.  It's an incident.

18    Read that portion to me one more time.

19             MR. SCALLY:  Well, um --

20             THE COURT:  That's an order not a request.

21             MR. SCALLY:  Yes, Your Honor.

22             "MR. LE:  How can they find anybody?  They're two

23    months ago.

24             "CI:  Oh, about that dude?

25             "MR. LE:  Yeah, that's about it.

1          "CI:  They came to your house?  That's crazy.  Why

2     are they questioning you?

3          "MR. LE:  The wife."

4          THE COURT:  Now, hold on.  I'm going to tell you

5     what I got out of that reading.  First of all, I would

6     speculate that they're referring to Dao's wife.  They're

7     referring to a life insurance policy and there was something

8     in the reading that I wasn't certain about it was 100,000 or

9     more.

10         So from this it sounds like this is a follow-up

11    conversation about the money that Mr. Le from your

12    perspective you would argue he believed he was going to get

13    from the wife.

14         MR. SCALLY:  Exactly, Your Honor.

15         THE COURT:  And the reference back to the incident

16    is obviously from your perspective back to the murder.

17         MR. SCALLY:  Yes, Your Honor.

18         THE COURT:  Are you going to be requesting a lesser

19    instruction of voluntary manslaughter?

20         MR. WILKE:  We're not ruling that out at this

21    point, Your Honor.  Obviously, it's a lesser -- on a

22    self-defense it would be an obvious lesser instruction.

23         THE COURT:  My guess is it usually comes from heat

24    of passion.  Not certain whether it comes from self-defense.

25    I think we both need to do a lot of research on that.  I

1    think most of us in the court system would be a little

2    concerned about not giving it if requested.  We'd hate to see

3    it returned by a failure to give you the broadest legal

4    theory.  I can't figure out why this would ever be an

5    involuntary manslaughter, though.

6            So it seems to me your tough tactical choice

7    eventually without indicating what you're going to do now is

8    you know that they're bringing a first, you know they're

9    bringing a second.  It sounds like they're gonna bring that

10   second under two different theorys specific intent or I'll

11   call it that and if not, then a gravely wanton act.  And then

12   the question is whether this is a voluntary manslaughter,

13   you'll be requesting is another lesser or included or not.

14           Now, is he selling some narcotics at that time?

15           MR. SCALLY:  Yes, Your Honor, that's Count 7.

16           THE COURT:  Now, just a moment.

17           If I was concerned about. . . I'm being very

18   careful about having narcotics, subsequent narcotics

19   transactions come into the case.  By the same token,

20   tentatively my thought would be both of these are relevant

21   statements being made through a CS.

22           And tentatively, one seems to be from your

23   perspective an overt admission to the crime and another is

24   essentially a conversation about not only the act which is

25   not self-incriminating, it just refers back to it.  More

1    importantly it bolsters the motive from your perspective of

2    getting some amount of money out of the wife.  I think you're

3    entitled to put that on tentatively.

4          The question is well, what do I do?  The more I

5    sanitize that, the more I'm concerned each of you accusing

6    one another and asking for a mistrial if the circumstances

7    surrounding that comes out.  So from your perspective, you

8    really want a court to let this in terms of its totality

9    because why is the CS getting together with the defendant?

10   What's the motivation?  Are they life-long friends?

11         Now, from the defense perspective, sometimes we win

12   a battle and lose a war.  Because if in fact this is

13   sanitized by the Court, then I'm going to be concerned about

14   you coming back and claiming fairness in this regard,

15   Mr. Wilke.  Judge, you know upon reflection, this looks like

16   they were lifetime buddies.  This looks like they grew up

17   together in the neighborhood.

18         So therefore these statements have greater

19   credibility because you see the jury doesn't know the

20   relationship.  The jury doesn't know these are a couple

21   people trading dope because the easiest way to attack these

22   statements is that the CS is a dope dealer, doesn't have a

23   good memory with one exception.  You've got this on tape,

24   don't you?

25         MR. SCALLY:  Yes, Your Honor.  I should also --

1          THE COURT:  Okay.  This is why you want these

2    narcotics in, but why do you need them substantively charged?

3    In other words, if the Court's indicated to you that this is

4    relevant evidence and agrees with Mr. Wilke that, you know,

5    you waited a year-and-a-half to file them.  I won't ask you

6    why, but, you know, waited about a year.  Why wouldn't I

7    sever these?  Tentatively, why wouldn't I let in these

8    statements also?

9          And here's the great danger.  Here's what you

10    should be thinking on both sides.  Judge, why does it make a

11    difference?  Once the statements are coming in shouldn't the

12    whole truth come in?  Shouldn't the surrounding transaction

13    coming in?  You know, for goodness sakes, we're playing with

14    a little bit of dope.  How prejudicial is that?  That's what

15    you're thinking.

16          But if I'm up at the 9th Circuit saying well, gee,

17    you know, I'm up there wondering why this did come in under a

18    substantive narcotic offense?  So don't go away for a moment.

19    I want to hear from Mr. Wilke as to these two counts because

20    I'm giving him a strong indication right now that both of

21    these statements are coming in.  His real request is to sever

22    out these counts, but his real request is to hold out these

23    statements because they're part of these counts.  That's his

24    real target because he's a very good attorney.  Mr. Wilke.

25          MR. WILKE:  Thank you, Your Honor.

1      I understand the relevance of the statements read

2 by Mr. Scally.  Those aren't the entirety of the recordings

3 made during these transactions.

4           THE COURT:  And you can get in any other portion.

5           MR. WILKE:  Well, there's other parts of them that

6 I think are subject to further motions in liminae that aren't

7 quite as relevant and far more prejudicial and we'll be

8 addressing that.

9           THE COURT:  Well, that's not the gravamen of the

10 motion today.  I'm giving you an indication as I go through

11 those transcripts.

12           MR. WILKE:  The issue, though, in our view is that

13 there is no relationship between the murder counts and the

14 drug counts other than one that is created by the

15 government's investigation.

16           THE COURT:  Let's say you prevail on that.  Let's

17 save a whole hour.  Okay?

18           MR. WILKE:  I'm good then.

19           THE COURT:  No, you're not because I've just

20 indicated to you that even if I sever those counts, the

21 statements are coming in.

22           MR. WILKE:  I --

23           THE COURT:  Now you'd want to argue strenuously

24 that they're not.

25           MR. WILKE:  Well, I'm not -- I understand the

1    relevance of them, but I also appreciate that it doesn't -- I

2    mean, the government's whole opposition to the motion to

3    sever is it's all based on overlapping evidence.

4            THE COURT:  Here's what you're already thinking.

5    You're excellent counsel.  You're really thinking, you know,

6    Judge, here's why it's prejudicial.  There's one difference

7    and that is Judge, if you let this in, that might be

8    relevant.  But we don't want the jury marking down a

9    substantive count, actually putting pen to paper and saying

10   guilty of a marijuana charge because it causes them then to

11   reflect upon character even more strenuously because they're

12   actually making a substantive decision on de minimis

13   marijuana claims and charges so I'm tentatively prepared to

14   grant your motion.

15           MR. WILKE:  And I appreciate that, but when the

16   Court says though that these statements come in what I

17   understand the Court to be saying --

18           THE COURT:  I'll just say what I'm saying.  You

19   don't understand me.  These statements in terms of

20   implication are coming in.

21           MR. WILKE:  At which trial?  At the murder trial.

22           THE COURT:  At the murder trial.

23           MR. WILKE:  Correct.  But they would not be

24   admissible I would submit and not be relevant at a drug

25   trial.  There's no relevance to the drug counts.

1          THE COURT:  We'll get to the drug counts that we're
2    about to sever a couple months later.
3          MR. WILKE:  Or earlier I think would be the proper
4    order.
5          THE COURT:  No, no, no.  They're going later.
6    We're having our murder trial first.
7          MR. WILKE:  I'd like to be heard on that.
8          THE COURT:  You will be heard.  Let me give you a
9    strong indication.  The murder trial is going first.  Okay.
10   So I'm going to sever Counts 6 and 7 so far.  And I'm going
11   to allow the relevant statements concerning the implication
12   and I'm going to then leave it to you to sort out that ruling
13   because I think you're going to have a hard time regarding
14   the surrounding circumstances which you're going to keep off
15   the table.  Mr. Wilk may make a far different decision at
16   trial and that is he may want get in the surrounding
17   narcotics sale.
18          Now, hold on for just a moment.  Let me rethink
19   that.  I'm going to sever Count 6 and 7.  I'm going to
20   indicate to you minimally that you're getting in the
21   implicating statements and the corroborative statements
22   concerning the insurance.  I'm going to delay how that's
23   coming in for a further discussion when we get through some
24   of these motions and rethink whether I want to allow you to
25   get in the fact that they're meeting over a narcotics sale

1    and whether that's overly prejudicial or just have you

2    present those statements and then leaving it to the defense

3    decide if they want to open that door or not.  Because the

4    defense is going to have a tough decision to make and that is

5    these statements may be even more credible if they're

6    believed to be life-long friends just meeting on the street

7    corner rather than the evil dope dealer doing business.  So

8    I'm going to just delay that for the moment, but these are

9    severed, Mr. Wilke.

10            MR. WILKE:  So if I can clarify --

11            THE COURT:  No, you're not gonna clarify.

12            MR. WILKE:  Well, what about the other drug counts?

13    We have multiple other drug counts.

14            THE COURT:  I'm getting to them.  That's just 6 and

15    7.  You tell me when I get to go on and don't clarify me.

16    You're in this court.  You're not in other courts now.  I

17    don't need clarification.

18            All right.  Now, the next one is Count 8 and

19    Count 10.  We're gonna go through the same process with both

20    of them.  We're going to single out Count 8, December 5th,

21    2019.  It's meth for 54.7 grams.

22            Now, here I get concerned.  You see I'm not too

23    concerned about 1.9 grams on Count 7.  I'm a little bit more

24    concerned when I get into 54.7 grams because the jury doesn't

25    know how much that is.  That's when you see this push back in

1    terms of narcotics because then you become the evil dope

2    dealer not just the little user.  And then I've got

3    56.5 grams.  And so the jury can't sort out the quantity and

4    they think 56 is a lot, but one doesn't sound like a lot

5    cause they're not using.

6         And that's why I'm more concerned quite frankly

7    about the narcotics transactions coming in, but the

8    statements seem to be appropriate.  I want you to take

9    December 5th, 2019.  I want you to read to me any implicating

10   statements you have concerning insurance, coverups, throwing

11   away a weapon, anything you've got.

12        MR. SCALLY:  There are none from December 5th,

13   2019, Your Honor.

14        THE COURT:  Count 8, December 5th.  Read.

15        MR. SCALLY:  Yes, I'm sorry.  There are no such

16   statements.

17        THE COURT:  Okay.  So I'm going to sever Count 8

18   and there's not to be a reference to Count 8.

19        Now, we have Count 10 where Le is the sole seller,

20   meth, December 10th, 56.5 grams.  And I want you to read any

21   implicating statements regarding the murder, disposal of

22   weapon, insurance.

23        MR. SCALLY:  Yes, Your Honor.  The -- Mr. Le and

24   the CI discussed the CI hiring Mr. Le for a murder for hire

25   and the CI asked Mr. Le what he thought his mistake was in

```
 1   quote "your last gig" in reference to the murder.

 2             THE COURT:  You would argue that.

 3             MR. SCALLY:  That would be my argument.

 4             THE COURT:  I want you to read that portion to me.

 5             MR. SCALLY:  The only quote I have available,

 6   Your Honor, is the CI asked, "Why did the Coast Guard go to

 7   your house?"  And Mr. Le said, "The wife knew that he went

 8   with me that we went fishing and that's about it."  And that

 9   we would be arguing is a reference to his presence at the

10   fishing trip in which he killed the victim.

11             THE COURT:  You already have that on numerous

12   occasions, though, don't you.  I mean, that's not too hard to

13   prove.

14             MR. SCALLY:  We do -- we do have statements --

15             THE COURT:  I'm just weighing the prejudice -- in

16   fact I'm weighing the probative value, how cumulative that is

17   and read what else you think is relevant.

18             MR. SCALLY:  I'm sorry, Your Honor?

19             THE COURT:  What else is relevant?  Is that it?

20             MR. SCALLY:  That's the -- that's the extent of the

21   statements made.

22             THE COURT:  Now, what about murdering or murder for

23   hire.  Read that portion to me.

24             MR. SCALLY:  I don't have the actual transcript,

25   but --
```

```
 1              THE COURT:  How long would you need to get that?
 2       You need to go back to the office?
 3              MR. SCALLY:  I would need to go back to the office.
 4              THE COURT:  Okay, we'll take a break.  Okay, then.
 5       Need to use the restroom at all?  15 minutes.
 6                          (Recess taken.)
 7              THE COURT:  Back on the record.
 8              And you were going to read to me concerning
 9       Count 10, December 10th, 2019, Le is allegedly the sole
10       seller.  It's methamphetamine 56.5 grams.
11              MR. SCALLY:  That's correct, Your Honor.  Thank you
12       for the opportunity to retrieve the transcripts.
13              "CI:  Get used to it.  Yeah.  Oh, coming with the
14       Coast Guard.  My boy wants to hire you.  Okay?"
15              And our argument would be that that's about a new
16       murder for hire.
17              "CI:  What do you think your mistake was from your
18       last game?
19              "MR. LE:  Huh?
20              "CI:  From your last game, what do you think your
21       mistake was cause I wanna know, you know what I mean?"
22              Uh, there's kind of some unintelligible portions.
23              "CI:  So why the Coast Guard go to your house?
24              "MR. LE:  Because, uh, wives know that, uh, she
25       wanted -- he went with me, but that's about it.
```

UNITED STATES DISTRICT COURT

1              "CI:  Cause I'm thinking that she's sticking up for

2      (unintelligible.)

3              "MR. LE:  Due I'm an outsider.

4              "CI:  Uh-huh.

5              "MR. LE:  I'm outsider, homeboy.  They don't know

6      who took it.

7              "CI:  Okay.

8              "MR. LE:  Because the phone was turned off.  It was

9      not on.

10             "CI:  He wants to know your resume that's what he

11     wants."

12             And our argument would be that that's about a new

13     murder for hire that he's talking about with Mr. Le.

14             "MR. LE:  I ain't fucking look my name, mother

15     fucker, online.

16             "CI:  Huh?

17             "MR. LE:  They put my name online.

18             "CI:  Your name online?  What do you mean?  The

19     Orange County Times on front page?

20             "MR. LE:  Huh?"

21             Then there's some kind of unintelligible.

22             "MR. LE:  When do you want to do it?"

23             Our argument would be that's about a new murder.

24             "CI:  Huh?

25             "MR. LE:  When do you want to do it?

UNITED STATES DISTRICT COURT

1          "CI:  I'll let you know.  But like I said, if he

2     wants to know your resume, do you want to meet him?"

3          Reference to the person he's trying to -- that the

4     CI is working with to hire Mr. Le for this new murder for

5     hire.

6          "MR. LE:  Not really.  I just want to do this job.

7          "CI:  Huh?

8          "MR. LE:  Not really.  I just want to finish a job

9     (laughing).

10         "CI:  This was his job?

11         "MR. LE:  I just want to finish it.  The less face

12    I know the better.  Give me the ten.  Want the gun out of the

13    room, the gun store."  And some unintelligible.  Then there's

14    a reference to the CI's name.

15         "CI:  You did say ten.  I'll give you ten.  I think

16    the only one that I know that did some -- oh, I think you're

17    the only one that I know that did something who got away with

18    it.  Everybody else I know they got --

19         "MR. LE:  They got an outsider; right?  No one

20    knows who I am because we don't -- and that's because for you

21    they're gonna tie to you to tie back.  Do you understand?"

22         There's some more comments.

23         THE COURT:  Well, read those to me.

24         MR. SCALLY:  MR. LE:  Yep -- or excuse me.

25         "CI:  Yep.

1            "MR. LE:  They -- they better cause that's the only

2      thing.  As far as they know, they think we did it, you know.

3            "CI:  Yep.

4            "MR. LE:  All right?

5            "CI:  And we know this.  No matter what the way."

6            And there's some unintelligibles spliced in through

7      here.

8            "MR. LE:  They will not know nothing.

9            "CI:  Huh?

10            "MR. LE:  They will not know who the fuck

11      (unintelligible) going to you (unintelligible).  They don't

12      know me.  They know you only.  Okay?  That's why you had a

13      rap, rap six (unintelligible) fuck it.  You know where you're

14      at?  You're at Hawaiian Gardens when everything happened."

15            The implication we'd be arguing is that Mr. Le

16      instructing is the CI that when Mr. Le commits this new

17      murder for hire the CI plans to be somewhere else as being an

18      alibi.

19            THE COURT:  Let's stop for just a moment.  Tell me

20      about CI or CI-2 or CS-2.

21            MR. SCALLY:  This particular CI, Your Honor?  This

22      is an individual --

23            THE COURT:  Old beef, arrested before, criminal

24      history, just people's friend because he's a good samaritan?

25            MR. SCALLY:  He has a criminal history, Your Honor.

1                    THE COURT:  What is it?

2                    MR. SCALLY:  He was arrested for counterfeiting.

3      He did some time, a couple years in state prison.  I'm not --

4      off the top of my head, I'm not sure.

5                    THE COURT:  What he's working off?  What pending

6      charges does he have or was he arrested for something or he's

7      being a good samaritan?

8                    MR. SCALLY:  So he's being paid.  So his motivation

9      in this case, Your Honor, was I can give you a little

10     background.  He was in contact with Mr. Le in connection with

11     some marijuana dealing around the time that the homicide

12     occurred.  After the homicide occurred, the CI was with

13     Mr. Le when Mr. Le went to go meet the victim's brother at a

14     restaurant and Mr. Le was going to tell the victim's brother

15     a false alibi about what occurred.

16                   THE COURT:  Okay.  Now just a moment.  So I'm

17     hearing number of reasons you might want to call him to the

18     stand.  First of all, you might want him to testify about

19     meeting the victim's brother concerning the life insurance.

20                   MR. SCALLY:  Concerning Mr. Le telling the victim's

21     brother about Mr. Le's false alibi for the night of the

22     murder.

23                   THE COURT:  And you have that on tape?

24                   MR. SCALLY:  Actually portions of that were

25     recorded by the victim's brother.

1          THE COURT:  Okay.  You have portions of that on

2    tape which I haven't heard yet.  And the second possibly

3    relevant portion is a reference back to an alibi in this tape

4    you have with CS-2; is that correct?

5          Yeah, let's read it again.  I've got lots of time

6    for you.  Read the whole thing again to me.

7          MR. SCALLY:  The December 10th, Your Honor?

8          THE COURT:  Yeah.  I want to hear with specificity

9    because I'm inclined not to allow this in I'm inclined and

10   very concerned about this is a collateral act going forward.

11   Prejudicial effect outweighs the probative value.  I don't

12   see that this is purchasing a weapon or hear a specific

13   target.  And even if I did, if this was a death penalty case,

14   you would probably get this into the second penalty phase as

15   an aggravating factor.  The idea I want to kill somebody

16   else.

17          In this case I've got some very grave concerns that

18   I don't think I want to start this case over by allowing this

19   in.  So read it to me again.  And I'm gonna tell you where

20   you might mark it and we might have a good discussion because

21   most of this is not coming in.

22          MR. SCALLY:  "CI:  Any way get used to.  Yeah.  Oh,

23   (unintelligible) coming with Coast Guard.  My boy wants to

24   hire you.  Okay?  What do you think your mistake was from

25   your last game?"

```
 1            THE COURT:  Now, just a moment.  Right there that
 2   might have some relevance.  What do you think your mistake
 3   was from the last what?
 4            MR. SCALLY:  Game, Your Honor.
 5            THE COURT:  Game.  What does he say?
 6            MR. SCALLY:  I believe. . .
 7            THE COURT:  Well, just read it to me.  You don't
 8   have to make it up.
 9            MR. SCALLY:  Well, yeah, the initial it's
10   unintelligible.
11            THE COURT:  Then it's unintelligible.  What he does
12   say?  What does your transcript say?
13            MR. SCALLY:  No, it says unintelligible,
14   Your Honor.
15            THE COURT:  Okay, that's enlightening.  Now,
16   doesn't seem very relevant so far.  So what does he say?  Is
17   that it?  In other words, why would I let this in without
18   even an answer being on the tape and leave in an accusation?
19            MR. SCALLY:  Well, Your Honor, because --
20            THE COURT:  Let me help you.  I'm not going to.  So
21   keep reading until I see something relevant here.
22            MR. SCALLY:  "CI:  From your last game, what do you
23   think your mistake cause I want to know, you know what I
24   mean?  Unintelligible.
25            THE COURT:  I've got that.  Keep reading.  Golly,
```

```
 1   gosh, I did it?  I don't hear that yet.

 2              MR. SCALLY:  "CI:  So why the Coast Guard go to

 3   your house?

 4              "MR. LE:  Because, uh, wives know that, uh, she

 5   wanted -- he went with me, but that's about it."

 6              THE COURT:  Now, hold on.  Wife referring to Dao's

 7   wife.

 8              MR. SCALLY:  Correct.

 9              THE COURT:  Wife went with me.  The inference being

10   maybe look at the life insurance?

11              MR. SCALLY:  No, no, Your Honor.  It went with me

12   on the boat on the trip from which the victim didn't return.

13              THE COURT:  Dao's wife went on the boat?

14              MR. SCALLY:  No, I'm sorry, Your Honor.  Mr. Le

15   says the wife knows that he went with me meaning. . .

16              THE COURT:  The wife, Dao's wife, knows that he Dao

17   went with me.  I think that's the turning point of the case,

18   Counsel.  I'm just joking with you.  I'm not hearing very

19   much that's relevant frankly other than character

20   forward-looking evidence, highly uncorroborated and I'm very

21   leery of this.  I'm going to preclude this, Counsel.  The

22   prejudicial effect outweighs the probative value.  I don't

23   see the foundation for this.

24              I will let you get in that one statement if you

25   think it's relevant, but I caution you I won't hesitate to
```

1    declare a mistrial in this matter.  So take your risk with

2    that one statement.  Even then I'm leery of this.  I don't

3    hear anything other than unintelligible.

4          MR. SCALLY:  Your Honor, are you precluding any

5    reference?

6          THE COURT:  Yes, at this time I am.

7          MR. SCALLY:  To the --

8          THE COURT:  As highly speculative and I would like

9    to hear an answer to that unintelligible and maybe it would

10   be relevant.  Now, when we don't have that, it's not your

11   fault.  It's just the transmission.  You've got time for a

12   story?  You have no --

13         MR. SCALLY:  Absolutely, Your Honor.

14         THE COURT:  Back in 1974 they had just come out

15   with this NASA hearing acoustics.  Very similar position of

16   you and Mr. Wilke who contacted JPL over here and they came

17   out with some incredible audio ability to hear, but all the

18   jurors had to get on headphones.  And they actually were able

19   to hear from unintelligible which was just a good person

20   listening to actually hear the conversation.

21         So go back and dig a little bit.  And if you could

22   get something more than unintelligible, great, but right now

23   the prejudicial effect outweighs the probative value.  If

24   this was a death penalty case, it might come in as an

25   aggravating factor non-statutory and weigh that about a

```
 1    future act, but this isn't a death penalty case.

 2            And I don't see the relevance unless we get some

 3    answers or some specific implication and to bolster the

 4    minimization of insurance, et cetera, you've got that three

 5    or four times over.  I don't think I'm inclined to take the

 6    risk with something as di minimus as this so I'm precluding

 7    it.

 8            MR. SCALLY:  Understood, Your Honor.

 9            THE COURT:  So you've got two areas now.  You've

10    got November 10th, 2019.  You've got Count 6.  You've got

11    Count 7, November 20th, 2019.  We're gonna spend days going

12    over these transcripts to see what's relevant or not and

13    chopping it up with you and Mr. Wilke.  Start next week some

14    time.

15            And then you've got, gosh, I think you've got

16    Count 11 and Count 12 which is your possession of meth and

17    possession of firearms which you are certainly going to be

18    able to present.  And then you've got some statements,

19    though.  You've got some statements to the Coast Guard.  What

20    count is that?

21            MR. SCALLY:  I'm sorry, Your Honor?

22            THE COURT:  I thought you had some statements that

23    were made.

24            MR. SCALLY:  To?

25            THE COURT:  I'm not gonna guess.  Do you have
```

```
1    statements made to the investigating agents by Mr. Le?

2              MR. SCALLY:  Oh, I'm sorry, Your Honor, yes.

3              THE COURT:  What count?

4              MR. SCALLY:  The statements that Mr. Le made were

5    on November 20th which is the date of Count 7.

6              THE COURT:  And do you have the false statements

7    charged?

8              MR. SCALLY:  For Mr. Le, no, Your Honor.

9              THE COURT:  Okay.  Just. . .

10             MR. SCALLY:  For Ms. Ritze.

11             THE COURT:  So what else is in contention here

12   before I hear from Mr. Wilke?  In other words, I have severed

13   the counts.  I've severed, Kelly, 6, 7, 10.  I'm allowing

14   statements that will be further developed in 6 and 7.  And

15   I've pointed out or you pointed out to the Court the

16   relevance of those.  I'm precluding 8 because there are no

17   statements that are relevant.

18             And I'm precluding 10 because the prejudicial

19   effect outweighs the probative value and these are

20   forward-looking acts that don't have a foundation to them in

21   my opinion.  Now, that leaves Count 11.  It's a possession

22   count.  Prejudicial effect outweighs the probative value I

23   would think of narcotics except for one thing.

24             Your argument should be Judge, would you consider

25   that because this was a narcotics transaction and the motive
```

1    apparently was Mr. Dao stiffing Mr. Le.  Mr. Le believed, I

2    think from memory, he'd get a couple hundred dollars back

3    that they were involved with or some statement to that effect

4    and life insurance.  So Judge Carter, why shouldn't we be

5    able to put in No. 11 to show Mr. Le is dealing in narcotics

6    on December 19th because even though it's continuing. . . So

7    what's the relevance?

8             MR. SCALLY:  If I could just have a brief moment,

9    Your Honor?

10            THE COURT:  Sure.  Take your time.

11            MR. SCALLY:  Your Honor, I think in light of the

12   Court's rulings severing the other drug counts so that would

13   be -- my understanding it's counts --

14            THE COURT:  6, 7, 8 and 10.

15            MR. SCALLY:  6, 7, 8 and 10.

16            THE COURT:  Now, you check it because I got tired

17   of flipping back and forth between the indictment and your

18   briefing, et cetera.

19            MR. SCALLY:  I see that, Your Honor.  I think

20   that's what I understood the Court's intention to be

21   Counts --

22            THE COURT:  Don't go fast.  6, 7, 8 and 10.  You

23   don't want me to sever the murder charge.  I'm just joking

24   with you.

25            MR. SCALLY:  6, 7, 8 and 10.  In light of the

```
 1    Court's ruling on those, I think the government's position

 2    would be that Counts 11 and 12 should go with -- be tried

 3    with Count 6, 7, 8 and 10.

 4              THE COURT:  I'm gonna sever those and that way

 5    we'll have a subsequent trial with 6, 7, 8, 10, 11, 12.

 6              MR. SCALLY:  And actually, yes, Your Honor.  And I

 7    have another comment in conferring briefly with Mr. Wilke. .

 8    .

 9              Your Honor, we think that counts, Count 4 and

10    Count 5 with respect to Mr. Le's trial should also go with

11    count --

12              THE COURT:  6, 7, 8 and 10.

13              MR. SCALLY:  And actually Count 9.

14              THE COURT:  Okay, Count 9.

15              You two get your record straight.  I got tired of

16    flipping back and forth between the briefing and the

17    indictment.

18              MR. WILKE:  It's actually just 4 and 12 go

19    together.

20              THE COURT:  Well, you two have a conversation.  We

21    can spend all day.  I'm gonna have you go out and come back

22    later this afternoon, probably tonight also so we can clear

23    this up very quickly.

24              MR. WILKE:  That's fine, Your Honor.  I think we're

25    in agreement Counts 4 through 12 will be tried together for
```

1    Mr. Le.

2              THE COURT:  For our purposes they're severed.

3              MR. WILKE:  Yes, Your Honor.

4              THE COURT:  But they're not precluded on Counts 6

5    and 7 concerning statements by Mr. Le that may indicate the

6    codefendant cause we don't have a hearsay problem any more.

7    Number two, we need to go through those transcripts and see

8    what's relevant or what's not.  What objections with

9    Mr. Wilke.  We'll get started with that in a while.

10             Now, does that take care of Mr. Le?

11             MR. SCALLY:  I believe so, Your Honor.

12             THE COURT:  Now, why am I making decisions

13   concerning Ms. Ritze?  Why don't I simply wait even though

14   Mr. Weichert's joined and see how my decisions are correct or

15   incorrect?  I see no reason why I'm making these decisions

16   now even though Ms. Ritze has joined.

17             MR. SCALLY:  That's fine for the government.

18             THE COURT:  So we're gonna delay those,

19   Mr. Weichert.

20             MR. WEICHERT:  Well, Your Honor, just from a trial

21   preparation standard --

22             THE COURT:  Oh, you'll be fine.  You're going to

23   trial in October.  You'll have lots of time to get there.

24   You'll be fine.  Now, I'll see if these are incorrect rulings

25   and I could sort those out as I go.  And I'll be cautious

1    about that, but I don't see any reason to tackle Ms. Ritze if

2    Mr. Le is going first.  If I've made a mistake, I can rectify

3    that in the second trial.  There may be something that comes

4    out on the transcript that you weren't aware of or I wasn't

5    aware of.  We've avoided all the hearsay problems now.  Okay.

6           MR. WILKE:  And can I be heard on one matter on the

7    severance issue, Your Honor?

8           THE COURT:  I just to make sure the government's

9    done.

10          MR. SCALLY:  I'm done on the severance issue.

11          THE COURT:  Counsel.

12          MR. WILKE:  I know the Court seemed inclined in

13   ordering the severance to have the murder counts go first.

14          THE COURT:  I'm sorry?

15          MR. WILKE:  The Court has indicated its preference

16   that the murder counts go first.  I'd like to be heard on

17   that issue.

18          THE COURT:  Please.

19          MR. WILKE:  And I believe we would request that the

20   Court schedule the drug counts first.  And the reason being

21   as I indicated in my papers is that Mr. Le would exercise his

22   privilege against self-incrimination at the drug trial.  To

23   make him go first on the murder trial, and then risk

24   basically creating statements at that trial which would later

25   be introduced by him at the drug trial, I think prejudices

1    him.

2          We believe that the drug trial is a very simple

3    trial, will not last very long and could be done in a

4    relatively short amount of time under the Court's current

5    schedule.  The murder trial is far more complex.  And we

6    believe that as part of the Rule 14 severance as well and the

7    prejudice to defendant that we would ask the Court to put the

8    murder trial first in the order -- the drug trial first in

9    the order of things.

10          THE COURT:  Thank you.  That's denied.

11          All right.  Now, the next motion would be I think

12    the vagueness of statute should be the next issue we should

13    take up.  This is a request to dismiss Counts 1 through 3 of

14    the second superseding indictment on grounds that the murder

15    statute 18 USC 1111 is unconstitutionally vague as applied.

16    And the documents I refer to are Document 152, 152-1, 153,

17    155, 164 and 171.  I'm sorry.  I also looked at 163 and read

18    that obviously, but that isn't part of this particular

19    motion.  I got it in the wrong stack.

20          So counsel, Mr. Wilke.

21          MR. WILKE:  Your Honor, the basic issue here, let

22    me say the government's argument in opposing our motion and

23    really the language that's been used by the 9th Circuit in

24    cases and the language that's used in the 9th Circuit model

25    instructions is essentially that an ordinary person can

1    understand the difference between acting deliberately and

2    acting with deliberation.  That's literally the distinction

3    between first degree premeditated murder and second degree

4    deliberate murder as its been defined by the 9th Circuit.

5            Any layperson hearing that, frankly, it's nonsense,

6    Your Honor.  There's no difference between acting

7    deliberately and acting with deliberation.  And when you

8    allow a charging decision of whether to seek the death

9    penalty or not or to file a charge that subjects somebody to

10   capital murder to be based on something that for which there

11   is really no distinction that's what renders it

12   unconstitutionally vague.  It's as simple as that.

13           This is an argument created by the 9th Circuit's

14   own laziness, if you will.  But that's what they have created

15   in the language that they have put in published cases makes

16   this distinction to be kind of illusory and meaningless and

17   it violates the defendant's right to due process.

18           THE COURT:  Counsel on behalf of the government.

19           MR. SCALLY:  Your Honor, the 9th Circuit is not an

20   outlier in its definition of premeditation.  The government's

21   cited a treatise from --

22           THE COURT:  I'm sorry.  Couldn't hear you.

23           MR. SCALLY:  I'm sorry.  The government cited a

24   treatise from ^Professor Lafave in its opposition that the

25   defendant must not have only intended to, but in addition he

1  must pre-meditate the killing and be deliberate about it.

2  And the sort of deliberation is not the same thing as

3  deliberately.  And because deliberation as defined in the

4  cases is second thought, reflection, consideration and that's

5  how the 9th defines it in ^Begay.  And the 9th Circuit is not

6  off a limb here apart from other courts.  We also cited the

7  First Circuit that with respect to premeditation, it is the

8  fact of deliberation.

9          THE COURT:  Can you go a little slower?

10         MR. SCALLY:  It is the fact of deliberation, of

11  second thought that is important.  And so, uh, the case law

12  shows that it is possible to make a clear and cogent analysis

13  of whether certain evidence establishes that somebody acts

14  with the planning and deliberation, planning or deliberation

15  that the model 9th Circuit jury instruction on this issue

16  requires.

17         So the government, um, the government's position is

18  none of the cases defendant cites are on point.  In the reply

19  brief, the cases defendant cite talk about different kinds of

20  statutes that actually don't require actual reflection or

21  consideration or deliberation, but instead define

22  premeditation by the passage of time.

23         And that's what makes the Arizona statute and I

24  believe it might have been the Nevada statute different.  And

25  even though state courts say it's when the statute requires

1    proof of actual reflection, they're constitutional and

2    they're not void for vagueness.  And that's exactly what the

3    federal statute requires under the 9th Circuit law as laid

4    out by the en banc panel in United States v. Begay.  So with

5    that, Your Honor, the government would submit there is no

6    vagueness problem with the federal murder statute.

7            THE COURT:  Mr. Wilke, Document 171 was your reply.

8            MR. WILKE:  Yes, Your Honor.  I'd submit it,

9    Your Honor.  I have nothing to add.

10           THE COURT:  The motion is denied.

11           Now, finally back to the original. . . Counsel, I

12    think that I want to return now to our original starting

13    point and that is the request by both of you to decide the --

14           THE COURT REPORTER:  I'm sorry, Judge.  I didn't

15    hear you.

16           THE COURT:  I'm sorry let me start again and thank

17    you.  Returning to the additional request by the parties

18    after the subsequent indictment was filed.  The parties have

19    once again requested and I think jointly that the Court

20    decide the special maritime and territorial jurisdiction of

21    the United States as applied to Counts 1, 2 and I think 3.

22    We can encompass three.

23           The Court previously indicated and used the word

24    incorrectly, but it was disinclined to do that regardless of

25    what initially appeared to be the defense request, but now

UNITED STATES DISTRICT COURT

1    it's certainly joined by the government.

2            My previous reasons are subject to a conversation

3    that we should have once again today and that is why this

4    Court would issue an anticipatory ruling not having facts in

5    front of it or even a stipulation concerning the location.

6    And I'd indicated before I would take this up at what I'm

7    going to call the Rule 29 or the directed verdict stage.

8            I understand tactically and so I'm not naive about

9    that position that it places both parties in, but regardless,

10   I still view this as anticipatory, it's discretionary.

11   There's no mandate on the Court to do this and I'm very

12   uncomfortable with it.  Now, I want to make your record and

13   subject to listening to that, but I'm a little disinclined to

14   change it.  So Mr. Wilke, please.

15           MR. WILKE:  I'd raise two issues, Your Honor.

16           One I think the Phillips case that's cited in the

17   joint parties' position makes it clear that where there's no

18   factual dispute and the legal issue can be decided by the

19   Court pretrial, the Court must decide it.  I think that's the

20   current state of the law.

21           The more practical level, though, and the reason I

22   think from the defense perspective why we'd like this ruling

23   is really for purposes of trial management and judicial

24   economy.  First, if the Court, and I don't think either party

25   has any idea how the Court's inclined to rule on this so this

1    is not I think tactics.

2            THE COURT:  Does it surprise you the Court doesn't

3    have any inclination either?

4            MR. WILKE:  I don't think anybody here is really

5    motivated by tactics.  Certainly, there are tactical

6    decisions to be made, and I trust that everybody has

7    considered those.  We certainly have, but I really do believe

8    that what is driving the parties' joint position here is just

9    the management of this trial.

10            And first, if the Court were inclined to rule for

11    the defense, okay, the government then would have to make a

12    call and then dismiss Counts 1 and 3.  The government would

13    have to make a call whether to appeal to the 9th Circuit

14    which they can do; right?  They have a right to an

15    interlocutory appeal or they kick it over to state court or

16    see they're going to proceed.

17            And we can move on with the drug counts and there's

18    a fairly manageable, easy trial.  We could probably do it

19    next week frankly if this were just about the drug counts.

20            If the Court were to rule in the government's

21    favor, the effect of that is that if the Court's wrong, the

22    defendant is then convicted, he can then appeal post-trial.

23    But it also at a more practical level really makes the trial

24    more manageable.  The nature of the evidence relating to the

25    precise location where these events occurred is all experts,

1    Your Honor.  It's all experts subject to Daubert challenges.

2            THE COURT:  Well, why wouldn't I want to hear that?

3            MR. WILKE:  Because the government has now conceded

4    even with their experts, even with the evidence they have, it

5    doesn't prove it beyond a reasonable doubt which I've known

6    this from last year.  That this evidence was equivocal and

7    that's we were so vociferous in litigating this issue.

8            And the government now -- we tried to convince the

9    government six months ago they should make that concession so

10   we'd be six months ago where we are at now.  They eventually

11   came around and now they agree with us the evidence can't

12   establish it.

13           If the Court says I'm gonna rule on the legal issue

14   after I hear the evidence, the government I think is going to

15   feel like they still have to give it a yoman's try and we're

16   going to spend -- literally this will increase the length on

17   this trial by 50 percent.  What would otherwise be an

18   8-to-10-day trial will become a 12-to-15-day trial.

19           THE COURT:  Why should I be concerned about that?

20           MR. WILKE:  Because a third of the trial will be

21   evidence that is the parties don't dispute it doesn't prove

22   it and evidence that frankly is a side show from the real

23   issues in this case which is whether a murder occurred,

24   whether Mr. Le acted in self-defense on that boat.  That's

25   what this trial should be about.  That's where the, I think,

1    the parties want to focus their efforts.

2          The amount of simple data and evidence relating to

3    this issue that the parties do not dispute is overwhelming,

4    Your Honor.  It's all electronic data.  It's all electronic

5    evidence.  We have been especially since the Court's last

6    hearing when the Court, when we were requesting a trial date

7    in April 2022 and the Court gave us a trial date in

8    August 2021, we're working full-time on the case since then.

9          And a large amount of it has been dedicated to this

10   evidence that the government's conceding it can't prove.  I

11   would much rather be focusing my trial preparation time on

12   what is -- I'd like to know the answer to this question and

13   if I'm right, I'd like the Court to dismiss it and we can

14   resolve the legal issue at some later time.

15         But if I'm wrong, if I'm wrong on the legal issue,

16   it doesn't matter whether it happened, you know, a rock's

17   throw off the shore or, you know, five miles off the shore.

18   Doesn't matter.  Yet we're going to spend a week litigating

19   this stuff and probably another two days on the Daubert

20   hearing on the cell sites, cell tower, GPS data stuff that is

21   all very equivocal and which is completely unnecessary with

22   the government saying even with everything we have, we can't

23   prove it beyond a reasonable doubt.

24         That's the current record we have now and I think

25   the issue, it's a purely legal issue.  What did Congress mean

1    in this statute.  It's a tough call, I agree, but I think

2    it's one only the Court can make.  It's not one that requires

3    any fact finding by the jury at this stage and I'd ask the

4    Court to make it.

5              THE COURT:  Counsel.

6              MR. SCALLY:  Your Honor, the Court did ask the

7    government the last time we talked about this issue whether

8    it has discretion not to make the ruling.  At that time given

9    the government's position that there was a factual dispute, I

10   think the Court did have discretion at that time.  Now, that

11   there is no factual dispute between the parties as to the

12   occurrence of the crime, the alleged crime, within the

13   12-mile band off the coast, without a factual dispute on

14   that, I think Your Honor --

15             THE COURT:  What about within three miles of the

16   coast?

17             MR. SCALLY:  Well, I don't know that we would

18   stipulate that it occurred within three miles, but we have

19   stipulated that we cannot prove beyond a reasonable doubt

20   that it occurred beyond three miles.  So, you know, and we

21   expect that our evidence is going to show basically as we

22   sort of worried aloud in our initial opposition to

23   Mr. Wilke's jurisdictional motion basically that the crime

24   occurred approximately three miles from the shore.

25             We have cell site data that places relevant parties

1    at that location, but the provision of the law that I'd cite

2    the Court to for the proposition that the I believe the Court

3    is under a mandate to rule pretrial on this is the Phillips

4    case that Mr. Wilke cited and we cited in the joint motion

5    and its citation of Federal Rule of Criminal Procedure of

6    12 D.

7            The Court must decide every pretrial motion or

8    every pretrial motion before trial unless it finds good cause

9    to defer a ruling.  And the Court must not defer ruling on a

10   pretrial motion if it will adversely affect the party's right

11   to appeal.  Mr. Wilke sort of laid out the procedural posture

12   of what could occur here.  The government is worried about

13   the, you know, if the Court continues not to rule on this

14   matter and rules on it as a jury instruction at trial instead

15   of the pretrial ruling on the legal issue that the

16   government's right to appeal will be adversely affected under

17   Rule 12 D.

18           THE COURT:  I want to thank both of you.  I'm going

19   to hold to my original ruling.  I do find good cause because

20   there is not sufficient evidence regardless of your

21   stipulations.  I'm not convinced you need to reach this

22   beyond a reasonable doubt yet as the standard because there's

23   a jurisdictional question.  I'm not certain of that by the

24   way and I'll state that for the Circuit.

25           If the government decides to take an interlocutory

1    appeal, I would approve that based upon my ruling, but I'm

2    going to decline to rule at this present time.  I want more

3    facts in front of Court.  I want to hear what your experts

4    have to say and I'm not too concerned whether it's an

5    eight-day trial or a 25-day trial frankly.

6           So therefore I think there's a lot of tactical

7    issues going into this quite frankly other than the legal

8    issues.  I think they're quite frankly for the government

9    because they're concerned about jeopardy.  And I take the

10   defense argument from 8 to 12 days or 20 days de minimis.

11   It's not of consequence to the Court and it won't detract.

12          So I do believe even under Phillips that I have

13   discretion and I'm making the ruling at the present time that

14   there's legal cause to delay until the Court has facts in

15   front of it which it does not regardless of your alleged

16   stipulation.  And I'm going to be very curious about the

17   three-mile limit and what I have to hear about that, let

18   alone the 12-mile limit.

19          Now, what else would you like to do today?

20          MR. WILKE:  Have lunch, Your Honor?

21          THE COURT:  Lunch is a good idea, counsel.  Are we

22   all going together?  I'm just joking for the record.

23          MR. SCALLY:  May I confer with counsel for just a

24   moment?

25          THE COURT:  Sure.

1          MR. WILKE:  There are two other matters, and I'll

2     do the least significant first because I'm afraid I'll forget

3     it if I don't do it now.  Would the Court order preparation

4     of the transcript for the defendants for this hearing and the

5     earlier hearing?

6          THE COURT:  Yes.  In fact for all hearings go

7     forward.  Would that be acceptable?

8          MR. WILKE:  Yes.

9          THE COURT:  Who will pay for that?

10         MR. WILKE:  Well, the Court hopefully.

11         THE COURT:  We probably should.  So ordered.

12         MR. WILKE:  The other issue, Your Honor, I know now

13    Mr. Le currently the homicide trial is set for currently

14    August 17th, I believe.  And now that we're going to have a

15    severed trial, it will only be those counts.

16         THE COURT:  Greatly reduced by the way.  Took it

17    from 20 days, I'm joking with you, to 12.

18         MR. WILKE:  But as I indicated in my earlier

19    arguments, literally the drug counts are two or three days;

20    right?  The homicide is what is driving this bus here.  And

21    with the Court's unwillingness to give us a pretrial ruling

22    on the jurisdictional issue, we're gonna have a much longer

23    trial dealing with significant amounts of expert testimony

24    that we were otherwise hoping to avoid.

25         We additionally, Your Honor, are still -- have a

 1    mental health evaluation pending.  We expect to have a report

 2    to the government by early July.

 3              THE COURT:  Just a moment.  These are the issues

 4    that are falling on deaf ears because when you have these

 5    problems you should be in my court immediately because I can

 6    help you with this like Fullerton Police Department.  I can

 7    help you with mental health, et cetera.  I'm signing these

 8    orders as soon I get them.

 9              MR. WILKE:  I'm not having problems other than the

10    movement of time in the universe, Your Honor.  There isn't

11    enough time to accomplish all that needs to be done to

12    provide the defense that I believe Mr. Le is entitled to.

13              THE COURT:  And obviously this is a request for a

14    continuance.

15              MR. WILKE:  It is.

16              THE COURT:  All right.  Denied.  You'll do your

17    best and if so, maybe we'll try this twice.

18              MR. WILKE:  I would simply ask the Court moving

19    Mr. Le's homicide trial to the October 19th date.  I don't

20    think Mr. Weichert would oppose that and I think that would

21    greatly enhance the ability of the defense to have this case

22    fully prepared.  And I mean, I could go through, I could go

23    through and tell the Court exactly what I'm dealing with, but

24    it's not nothing I blame the government on.  It's just the

25    volume of material that's at issue in this case.  Primarily

1    now driven by the production of the electronic data in the

2    case which is literally, it's two terabytes of information,

3    Your Honor, of which we have electronic devices from multiple

4    people that we can spend weeks roaming through and we're

5    trying to do it an organized and efficient manner, but the

6    amount of the volume of materials is overwhelming for me and

7    the people I have helping me on this case.

8               THE COURT:  Anything further?

9               MR. WILKE:  So the Court's denying my request to

10   continue?

11              THE COURT:  Anything further?

12              MR. WILKE:  With that I actually request the trial

13   be moved to October 19th, the homicide trial?

14              THE COURT:  Anything further?

15              MR. WILKE:  No, Your Honor.

16              THE COURT:  Denied.  We'll do our best.

17              Why don't you go to lunch.  Why don't we get

18   together next week because I want you to start on the

19   transcripts informally.  We have plenty of time.  This case

20   is getting old.  It's been around well over a year,

21   year-and-a-half.  It's been sitting around during the

22   pandemic.  You've had plenty of time to prepare now.  And I'd

23   like to see these transcripts worked on between the two of

24   you, but if you're unavailable, I'll simply bring you into

25   court.  I'd like your participation in this.

1          Mr. Le I think you're our primary focus right now.

2     For Ms. Ritze we will get to any of transcripts if there are

3     such at a later time.  I want to see how these rulings play

4     out in the first trial quite frankly.  I think Mr. Weichert

5     has always expressed a desire to go, well, initially first

6     and then second.  I'm gonna honor that request.  So you'll be

7     going to trial in October.

8          Do you want to get together informally and work on

9     these transcripts or simply have you brought back into court?

10    I'm gonna bring you back regardless next week because now

11    we're working 24/7.  We're gonna get this done.  Kelly, put

12    them on the schedule for 4 o'clock.  Ordered back into court.

13    If you've completed the transcripts, so be it.  If you

14    haven't and you've got disagreements, we'll take it at

15    4 o'clock because we'll be in trial.

16          Thank you very much.  We'll be in recess.

17          (Proceedings were concluded at 11:30 a.m.)

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

COUNTY OF LOS ANGELES        )
                             )   SS.
STATE OF CALIFORNIA          )

I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

DATE:  JULY 5, 2021


     /s/  LAURA MILLER ELIAS
LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER